EXHIBIT "B"

JEFF FINE
Clerk of the Superior Court
By Sara Barba, Deputy
Date 05/01/2020 Time 15:59:14
Description                        Amount
-------- CASE# CV2020-093023 --------
CIVIL NEW COMPLAINT                333.00

TOTAL AMOUNT                       333.00
        Receipt# 27768641

**RIGGS, ELLSWORTH & PORTER, PLC**
Wesland J. Wright (No. 029465)
1423 S Higley Road, Suite 113
Mesa, AZ 85206
Telephone: (480) 539-9400
Email: Wes@riggslaw.com

**MOONEY, WRIGHT, MOORE & WILHOIT, PLLC**
Paul J. Mooney (No. 006708)
Jim L. Wright (No. 010531)
1201 South Alma School Road, Suite 16000
Mesa, Arizona 85210
Telephone: (480) 615-7500
Email: pmooney@mwmwlaw.com

*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| DONALD WILLIAMS, JR., | No. CV2020-093023 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| STATE OF ARIZONA; ARIZONA DEPARTMENT OF ECONOMIC SECURITY; ARIZONA DEPARTMENT CHILD SAFETY; and LUCERO GARCIA; JOHN DOES I-V; JANE DOES I-V; ABC-XYZ CORPORATIONS; and, BLACK and WHITE PARTNERSHIPS, jointly and severally, | (42 U.S.C. § 1983; Interference with Parental Relationship with child; Intentional Infliction of Emotional Distress; Negligence; and Constructive Fraud) |
| Defendants. | |

Plaintiff, Donald Williams, Jr., for his complaint against Defendants, alleges:

## JURISDICTIONAL ALLEGATIONS

1.   Plaintiff Donald Williams, Jr., ("Father") is the natural father of "Melody D.", a minor child ("the Child").

2.   "Melody D." is a fictitious name used to protect the minor child's identity.

3.   Defendant State of Arizona is a body politic of the United States of America. It employed defendant Lucero Garcia as a case manager for the Arizona Department of Child Safety ("DCS"), a division of the Arizona Department of Economic Services ("DES").

4.   Defendant Lucero Garcia, ("Garcia)" at all times relevant to this Complaint, was an employee of the State of Arizona.

5.   Defendants John Does I-V, Jane Does I-V, ABC-XYZ Corporations and Black and White Partnerships are fictitious names and Plaintiff will amend the Complaint when their true and correct names are ascertained.

6.   Defendants caused events to occur in Maricopa County, Arizona out of which this complaint arose.

7.   Pursuant to the Arizona Rules of Civil Procedure, Rule 26.2 (c) (3), the Court should assign this case to TIER 3 as the action(s) claims damages in excess of $300,000.00.

8.   A JURY TRIAL IS REQUESTED.

## SUMMARY

9.   Father's parental rights were unlawfully denied by the State of Arizona, acting through DCS, and its employees and/or agents, who acted either deliberately, and/or with reckless indifference, and/or in a grossly negligent manner to deprive the Father of his parental rights as the Child's natural father, resulting in his separation from and loss of the love, companionship and affection he was entitled to as the Child's Father.

10.   In addition, the actions of the State of Arizona, acting through DCS and its employees or agents continued, notwithstanding a published Opinion from the Arizona Court of Appeals ("Opinion"), finding that DCS acted improperly in seeking to terminate

MOONEY, WRIGHT,
)ORE & WILHOIT, PLLC
MESA, AZ

1  Father's parental rights. Such actions include DCS requesting Father undergo a completely

2  unjustified and unnecessary psychological examination not ordered by the juvenile court.

3       11.    Even after the Arizona Supreme Court denied DCS' petition for review, DCS

4  still objected to Father's motion to dismiss at the Juvenile Court level.

5       12.    Parents have a fundamental liberty interest in the care, custody and

6  management of their child and this does not evaporate because they have lost temporary

7  custody of their child. *Santosky 11 v. Kramer,* 455 U.S. 745, 753 (1982). *See also* A.R.S. §

8  1-602(A), (D); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005).

9       13.    Defendants are statutorily required to make diligent efforts to preserve the

10  family. Facilitating regular contact between the parent and child is the most basic essential

11  of these services.

12       14.    Parents have a fundamental liberty interest under the XIV Amendment to the

13  U.S. Constitution in the care, custody and control of their children. *Meyer v. Nebraska,* 262

14  U.S. 390, 399, 401 (1923).

15       15.    This fundamental right includes a fundamental constitutionally protected

16  liberty interest in ongoing "companionship and society" with the child, and this includes

17  protection of the relationship between the parent and child even if the child is in state

18  custody. *Kelson v. the City of Springfield,* 767 F.2D 651, 654 (9th Cir. 1985).

19       16.    Conduct that deprives a parent of that interest violates due process. *Wilkinson*

20  *v. Torres,* 610 F.3d 546, 554 (9th Cir. 2010), *cert. denied,* 562 U.S. 1219 (2011), citing

21  *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008). *See also, Ariz. State Dep't of Pub.*

22  *Welfare v. Barlow*, 80 Ariz. 249, 252, 296 P.2d 298 (1956) ("Because the child has attained

23  a favored, beneficent status in our social and legal systems does not detract from the well-

24  settled rule that the right of parents to the custody of minor children is both a natural and a

25  legal right.").

26

17.     Liability under 42 U.S.C. §1983 exists for damaging the parent child relationship where the conduct of the state actor is so intrusive "as to be the equivalent of termination of that relationship." *Kelson, supra* at 654 ("The parent-child relationship is constitutionally protected and governmental interference with it gives rise to a section 1983 action for damages.").

## FACTUAL ALLEGATIONS[1]

18.     Father met the Child's natural mother ("Mother"), while the two of them were living in Sacramento, California, where they lived together for a short time. After discovering she was pregnant, Mother moved to Arizona. Given the brevity of the relationship, Father was unsure if he was the biological father of Mother's unborn child. He told Mother that if he was the Child's Father, he wanted to parent the Child. Father maintained contact with Mother until October 2014.

19.     Father later discovered that Mother had married someone else around the time she stopped communicating with him. Mother gave birth to the Child in Arizona on December 5, 2014. DCS took custody of the Child from the hospital the next day and placed her in foster care. DCS then filed a dependency petition regarding the Child, stating that the Mother's parental rights to the Child were terminated.

20.     On January 2, 2015, Mother reached out to the Father for the first time since October 2014 and told him that her husband was the Child's father. Skeptical, the Father called the Mother's husband, who informed him for the first time that the Child was in DCS custody.

21.     On January 3, 2015, the Father called the assigned DCS case manager, Garcia, explaining that he believed he was the Child's Father, and requested a paternity test. The

---

[1] Many of the facts set forth herein come directly from the Opinion.

case manager told him that the judge would have to award him a paternity test before that could be done.

22.     Following the Father's contact with the DCS case manager, DCS amended its dependency petition to include the Father, but DCS alleged that the Father was not married to the Mother and that he had not established his claim to paternity.

23.     In addition, DCS alleged in its amended petition, without any factual basis for so claiming, that the "Father is unable to parent due to neglect," and that he "is unable to provide [the Child] with the basic necessities of life, including food, clothing, shelter and support." DCS further alleged that the "Father has abandoned [the Child]," and "failed to maintain a normal parental relationship without just cause," and that this had continued "since the Child's birth." (Amended Petition for Dependency, ¶¶5–6)

24.     The case manager, Ms. Garcia, signed the Verification to this Amended Petition, swearing to the veracity of the statements made therein. In addition, although DCS did ask the Court to issue a judgment of paternity, it only included the Mother's assertion that her husband was the Child's father, and it did not mention anywhere that the Father had contacted DCS believing he was the Child's natural father.

25.     On March 9, 2015, the Arizona juvenile court held an initial dependency hearing. During that hearing, the Father denied the allegations of unfitness made by DCS in its Amended Petition. At that hearing, the Court ordered DCS to conduct a paternity test, and scheduled a dependency hearing for May, 2015. The results of the paternity test, dated April 15, 2015, confirmed that the Father was the Child's natural father.

26.     To demonstrate his interest in the Child and his desire to obtain custody, the Father enrolled in a thirteen-week parenting class, which he completed in August of 2015.

27.     Although the Child had been in DCS custody since birth, after the dependency hearing, the court established a case plan for "family reunification," and on

May 27, 2015, DCS filed its notice of lodging the order of paternity, which the court issued two weeks later. As of this date, the Child was seven months old.

28.     Sometime during the summer of 2015, DCS initiated an Interstate Compact on the Placement of Children ("ICPC") with the State of California, where the Father continued to reside. In November of 2015, the Arizona juvenile court held a review hearing where it addressed the pending ICPC, directed DCS to provide a written transition plan to move the Child to California to live with her Father, and found the Child to still be dependent.

29.     The ICPC report, dated December 2015, was favorable to placement with the Father. In fact, the ICPC case worker in California interviewed the Father in his home, and then separately interviewed his ex-wife, children, and a friend. The report specifically found that the Father's ex-wife stated that he "was a good father who cares and provides for his children." And, after interviewing the Father's other children at their school, the social worker further noted that: "It is obvious that [the children] feel loved and cared for by their father and that he is very involved in their lives."

30.     The California ICPC report concluded: "[Father] had good references and all stated that [he] is an excellent parent to his children. From observation, it appears that he has a positive relationship with his children and that they look to him for attention and affection. [Father] was the non-offending parent and has been diligent in seeking custody from the court in Arizona. * * * Placement of the Child with the Father is approved."

31.     Early in the dependency, Father asked DCS for the foster placement's contact information because he wanted to check on the Child. DCS refused and did not allow Father to have contact with the foster mother until the Child was almost one year old. DCS then gave Father the foster mother's email address, and the two began communicating weekly with updates and exchanging pictures of the Child.

32.     In January 2016, DCS finally allowed Father to have contact with the Child, and he began sending "Glide videos." Father recorded and sent the video messages to the foster mother's phone. She showed the videos to the Child and recorded messages to send back to Father. Father and the foster mother established a routine of exchanging Glide videos several times a day, which they continued throughout the dependency proceedings.

33.     Although California sent DCS the ICPC approval letter in December 2015, during the February 2016 review hearing, the case manager stated incorrectly that the ICPC had only been "verbally approved." Again, the juvenile court found the Child continued to be dependent. Father attended the February 2016 hearing and anticipated visiting the Child for the first time in person while in Arizona. Because DCS failed to communicate with Father regarding a visit before the hearing, no visit was scheduled. However, Father was able to see the Child for one hour at a fast-food restaurant with the foster mother.

34.     In April 2016, the case manager finally emailed Father a transition plan:

> "Just to reiterate our conversation from today. You will try to come out twice a month if possible to Arizona to visit [the Child] as much as you can. You will also begin calling [her] every Monday, Wednesday, Friday and Sunday at 6:30 pm. The phone call should be about 5–10 minutes. This way [she] gets to know your voice and also recognize it. Lastly, you will notify me at least two weeks in advance when you plan to visit [the Child] so that I can submit a case aide request."

35.     Father began calling the Child as directed. In addition, he continued to exchange the Glide videos, and he rented a car and drove his mother, father, and son to Arizona for a weekend visit to meet the Child. In the June 2016 DCS Report, while still reporting that "[Father] will need to be further assessed to determine appropriate services," the case manager stated:

> "[I have] attempted to coordinate with [Father] to set up a transition plan for [the Child] to be moved into his care, however he has failed to follow through with the transition plan. [DCS] no longer believes that it is in the Child's best interest to place her in the care of his [sic] father as he does not appear to be committed in the reunification process."

MOONEY, WRIGHT,
)ORE & WILHOIT, PLLC
MESA, AZ

36.     On July 12, 2016, DCS moved to terminate Father's rights based on abandonment and fifteen months' time-in-care. At the time of the motion, the Child was 19 months old, and DCS was still making efforts to locate an adoptive placement. Despite DCS moving for termination, Father continued to visit the Child when he was financially able and consistently communicated with her through Glide videos.

37.     When reviewing the case plan in September 2016, the Foster Care Review Board expressed its concern with the case manager's lack of communication. It reported that she was not present for the review; attempts to contact the case manager and her supervisor were unsuccessful; and she failed to provide a current case plan document for review. The Board determined "there are significant service gaps or system problems" and it was "unable to conduct a thorough review" because it had "inadequate information."

38.     By October 2016, DCS closed the ICPC because there had "not been any progress made toward transitioning [the Child] to [Father]." The October 2016 DCS Report stated that because Father had only visited the Child twice, he "[did] not appear to be interested in reunifying with his daughter." In April 2017, when the Child was two and a half years old, the juvenile court ordered Father to complete a Bonding/Best Interest Evaluation ("Bonding Assessment"), which was conducted by Dr. Mary Oakley on June 6, 2017.

39.     The court heard evidence on DCS's termination motion in July 2017 ("2017 Hearing"). At the hearing, the case manager testified that DCS wanted once-a-month visits at first, then intended to increase the number of required visits before reunification even though Father "had indicated that he had money issues, financially, and he wasn't able to complete" once-a-month visitation.

40.     At the hearing, the case manager was asked why DCS had not sent the Child to California to visit Father. She stated: "Because we just can't send the Child out there. We know—that's not the process. We normally increase contact with the parents."

MOONEY, WRIGHT,
)ORE & WILHOIT, PLLC
MESA, AZ

41.     The court questioned whether DCS had a program to offer financial assistance to out-of-state parents. The case manager responded: "Not that I know of, no." When asked if DCS could have moved the Child into a California placement to be closer to Father, she responded: "I don't believe so."

42.     After hearing the evidence, the court concluded it could not "sever rights, because people are poor" and denied DCS's motion for termination. The court then ordered DCS to (1) "staff with the unit psychologist regarding all factors in this matter including father's financial status to develop a transition plan"; (2) provide transportation for Father's visits, including airfare and transportation to and from the airport and the visitation center to see the Child; and (3) have the visits occur once a month, pending the opinion of the unit psychologist and the transition plan.

43.     DCS objected to paying for Father's airfare, stating it "is the most expensive way" and that DCS does not have "unlimited resources." However, the court determined, "as [the case manager] stated, it's a long drive from Sacramento," and flying was the most reasonable option. The court held that the "option needs to at least be tried" because "I cannot, in good conscience, say . . . you're too poor, so we're going to sever you." DCS booked and paid for Father's visit in September 2017, which he attended. But DCS failed to produce the court-ordered transition plan. The October 2017 DCS Report stated:

> "[The case manager] has also consulted with the unit consultant to come up with a transition plan to transition [the Child] into father's care, however the unit psychologist indicated that this needed to be done with the assigned evaluator that completed the [Bonding Assessment] as she had more knowledge as to the relationship between the father and child."

44.     Before Father's October 2017 visit, the court held a review hearing and ordered Father to increase his visits to weekly, six hours on Saturday and six hours on Sunday. DCS again objected to purchasing Father's airfare, and the court modified the order

to allow DCS to reimburse Father upon arrival. Accordingly, Father purchased the airfare for the last weekend of October 2017 and the first weekend in November 2017.

45.     When Father arrived for his October visit, DCS did not immediately reimburse him as the court ordered it to do. Instead, on November 1, 2017, DCS moved to modify the court's order, this time requesting permission to reimburse Father within three weeks of receiving his claim to allow for approval and processing.

46.     Father arrived for his November 6, 2017 visit before the court ruled on DCS's motion. Again, DCS did not reimburse Father on arrival. On November 21, 2017, the court granted DCS's motion, vacated the October order, and ordered DCS to reimburse Father "for his travel expenses up to three weeks after [DCS] receives a receipt for the purchase of travel."

47.     DCS failed to reimburse Father within the three weeks per the court order. Because of the out-of-pocket expense and reimbursement delay, Father was no longer able to afford to travel to Arizona for the weekly visits, and he canceled the visits scheduled for the remainder of November.

48.     In the DCS Report dated January 26, 2018, the case manager acknowledged that "[Father] also reported that he was waiting to get the flight refunds from DCS so that he could book another flight." She testified that she did not know how long it took for Father to receive reimbursement checks, and there had been a "lack of communication" that caused "an issue."

49.     In February 2018, DCS again moved to terminate the parent-child relationship based on fifteen months' out-of-home placement. By then, the Child was a little over three years old.

50.     The juvenile court held a second termination trial in July 2018 ("2018 Hearing"). The termination motion cited Father's "unstable employment," which it stated "ha[d] been a frequent problem since the beginning of this case," that Father "ha[d] been

unable to demonstrate an ability to parent the Child," and that "Father ha[d] failed to establish and maintain a normal parental relationship with his Child."

51.     The juvenile court found that Father's "substantial failure to engage in visitation" was the circumstance that was currently causing the Child to remain in out-of-home placement, and that, despite DCS's reimbursement of Father's travel expenses, he had not been able to remedy the circumstance. The court additionally found that termination was in the Child's best interests, and granted DCS's motion to terminate the parent-child relationship. The Child was three and a half years old. Father timely appealed from the Court's order.

52.     The Court of Appeals found the DCS Dependency Petition was "factually deficient" and that the out-of-home placement was not supported by the evidence. Specifically, the Court found:

> "The record is devoid of any evidence supporting the unfitness allegations in the petition, a fact DCS acknowledged at oral argument before this court. Mother had lived with Father in Sacramento, where the couple conceived [the Child]. Mother decided to move to Arizona. Even so, Father proactively maintained contact with Mother and told her he wanted to be involved in parenting the Child. Mother ended the communication with Father once she married. Despite Mother's deception in telling Father that he was not [the Child's] father, he called Mother's husband, found out [the Child] was in DCS's care, and immediately contacted DCS requesting a paternity test. The case manager told Father to contact the juvenile court, which he did. Father diligently complied with the ordered paternity test, appeared for the hearings, participated in parenting classes, and contested the allegations in the dependency petition. No evidence supported a dependency finding that Father failed to take concrete steps to establish a legal and emotional bond with [the Child], or that Father neglected or abused [the Child]. Thus, DCS lacked a factual basis to allege that [the Child] was a dependent child."

53.     The Court of Appeals noted that not only was the Defendant's dependency petition itself baseless, but the juvenile court had failed to make independent findings

"based upon the record and evidence presented" to "[d]etermine whether a factual basis exists to support a finding of dependency."

54. The lack of factual support for the allegations in the petition relating to Father's unfitness created significant concerns about the ethical propriety of filing the dependency petition claiming Father abused or neglected and abandoned the Child. In fact, the Court of Appeals noted that: "Nothing in the April 2015 DCS Report supported DCS's allegations against Father of abuse, neglect, or abandonment, nor did it establish that [the Child] lacked a parent who was willing or able to exercise proper and effective care and control. Instead, the April 2015 DCS Report demonstrated that Father was the Child's parent, he wanted custody of her, and DCS lacked any knowledge to support its contention that Father could not care for the Child."

55. DCS also failed to offer appropriate services to remedy the circumstances that caused the out-of-home placement of the Child in this case. Moreover, DCS misrepresented the facts to the juvenile court, and it demanded that the Father remedy the condition by imposing unreasonable requirements on him.

56. The actions of DCS undermined the Father's efforts to form a relationship with the Child and needlessly prolonged the dependency. On top of that, DCS exacerbated the problem by conducting an eight-month investigation into the Father's ability to parent, without ever submitting any evidence – other than conclusory assertions – that he was not fit to parent the Child. Indeed, the only circumstance that caused the Child to remain in out-of-home care after Father established legal parentage was DCS's "uncertainty" about Father's fitness.

57. DCS had no evidence that Father was unfit, and it failed to act before pursuing a dependency to resolve its unfounded concerns. As such, rather than making diligent efforts to transition the Child to her Father's care, DCS chose to undertake an eight-month investigation into whether the Father was fit.

58.     Then, DCS failed to make any effort – let alone a "diligent" effort – to adopt a transition plan that had any likelihood of success. Instead, DCS failed to communicate with the Father, and frustrated his efforts to comply with the transition plan he was asked to follow at every turn. It is more than clear from the record that any "deficiencies" in the Father's efforts were actively thwarted by DCS and its case manager.

59.     The Court of Appeals reversed the determination of the juvenile court and remanded the case for proceedings consistent with its Opinion, including the Father's request to have legal custody of his daughter.

60.     DCS petitioned the Supreme Court of Arizona for review of the Court of Appeals' Opinion, which the Supreme Court denied.

61.     While the petition for review was pending, DCS requested Father undergo psychological evaluation without any justification for doing so, or a Court order. This conduct by DCS manifests a flagrant disregard for the Court of Appeals' Opinion and its finding that the Father's parental rights have been thwarted at every turn.

62.     As a result, after the Court of Appeals issued its Opinion, the Child remained in foster care under DCS's supervision. DCS continued to act in bad faith and ignore the Father's – and the Child's – rights to live together.

63.     After the Arizona Supreme Court denied DCS' petition for review, Father filed a motion to dismiss the dependency action in Juvenile Court. The motion was granted and daughter has finally been transferred to California to be with Father. However, even after the Court of Appeals' lengthy criticisms of DCS' reckless actions, DCS unbelievably objected to Father's motion to dismiss.

64.     The actions taken by DCS to prevent the Father from having and maintaining a relationship with his daughter are almost inexplicable. DCS has filed multiple motions to terminate the Father's parental rights without supporting evidence. This constitutes abuse of the legal process.

65.     In addition, because DCS continued to maintain its position and to perpetuate it after the Court of Appeals issued its decision and after the Supreme Court denied its Petition for Review, DCS is guilty of willful and deliberate interference with the parent-child relationship between the Father and his daughter.

66.     DCS has acted either deliberately, and/or with reckless indifference, and/or in a grossly negligent manner to deprive the Father of his parental rights as the Child's natural father, which has resulted in the Father's separation from and loss of the love, companionship and affection he is entitled to as the Child's natural father.

67.     The actions of DCS, by and through its agents and employees have been taken without any factual or legal basis and have been supported by misrepresentations of the material facts to several different Arizona courts, all of which have caused significant and damage to the Father, including but not limited to fraudulent and/or misleading statements made about him personally, which were made solely to deny him his rights as Father of the Child, and his right to have a relationship with her. In the process, such actions have also damaged the Child by depriving her of the association, love and affection of her Father.

68.     To the extent these actions by DCS and/or its agents or employees have been undertaken intentionally – which a number of them have been – such conduct is at a minimum defamatory and/or constitutes "false light" invasion of the Father's privacy rights, and it has damaged his reputation as the Child's father, not only in her eyes, but in the eyes of others.

69.     Those same actions have deprived the Father of his association with his daughter and the opportunities to spend time with her and to develop a closer relationship, as well as her opportunity to enjoy the love and companionship and association with her father during her pivotal developmental years. This loss of association, love and consortium can never be recovered. At the very least, such actions have been undertaken with reckless disregard and/or indifference to the rights of the Father and his Child. As such both he and

she have claims that can be asserted for the deprivation of those rights by DCS and its employees or agents.

70. Defendants' conduct described herein violates clearly established constitutional and statutory rights of plaintiff which a reasonable person would have known.

71. Alternatively, DCS's actions have been negligent, notwithstanding its duty to protect and preserve the relationship of parent and child, a duty which it has clearly breached in this case, causing significant damages to both the Father and the Child as a direct and proximate result of DCS's actions and those of its agents or employees.

**FIRST CLAIM FOR RELIEF**
**INTERFERENCE WITH PARENTAL RELATIONSHIP**
**(42 U.S.C. § 1983)**

72. Plaintiff incorporates herein by this reference all the preceding numbered paragraphs as though fully set forth herein.

73. In committing the above referenced actions and/or omissions, Defendant State of Arizona, acting through DCS, and its employees and/or agents, and defendant Garcia, acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States of America, thereby violating Plaintiff's fundamental constitutional rights and thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983; and further being deliberately indifferent to the known damage being done to Plaintiff's ongoing relationship with the Child and taking no action to correct or stop that damage.

74. Defendants' conduct described herein injured Plaintiff's fundamental constitutional right to maintain a relationship with his daughter.

75. Defendant State of Arizona, acting through DCS, and its employees and/or agents, had absolute knowledge of the acts of Garcia described herein.

1  76. Defendant Garcia's actions were deliberately indifferent to Plaintiff's
2  constitutional rights as a parent and she was in a position to take action to protect Plaintiff's
3  parental relationship with the Child, but failed to do so.

4  77. DCS supervisors ratified the Garcia's act of alienation of affection by taking
5  no action against Garcia for her acts described herein.

6  78. Pursuant to 42 U.S.C. § 1983, Defendant Garcia is liable to Plaintiff for the
7  above described violations of Plaintiffs Constitutional rights.

8  79. Plaintiff is entitled to all rights, remedies, in law or in equity, available to him
9  under 42 U.S.C. § 1983.

10  80. As a proximate result of Defendants' actions and inactions (omissions),
11  Plaintiff has suffered the loss of any relationship with his daughter Melody O., suffered
12  humiliation and degradation and injury to his parental constitutional rights.

13  81. Plaintiff is entitled to recover their reasonable costs and attorney's fees under
14  42 U.S.C. § 1983.

15  82. Plaintiff is entitled to punitive damages.

**SECOND CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

18  83. Plaintiff incorporates herein by this reference all the preceding numbered
19  paragraphs as though fully set forth herein.

20  84. Defendants' acts and conduct in alienating the Child's affection with her
21  father, as more fully set forth above was extreme and outrageous.

22  85. Defendants provided false information to the juvenile court regarding the
23  Father's fitness to parent the Child.

24  86. Defendants' actions were intentionally done or at a minimum recklessly done
25  to injure the parent child relationship between Father and the Child.

26

1   87.   Defendants' actions caused severe emotional distress to Plaintiff and have

2   severely damaged the relationship between the Child and Plaintiff.

3   88.   Plaintiff has suffered damages in an amount to be proven at trial.

4   89.   Plaintiff is entitled to punitive damages.

**THIRD CLAIM FOR RELIEF**
**CONSTRUCTIVE FRAUD**

7   90.   Plaintiff incorporates herein by this reference all the preceding numbered

8   paragraphs as though fully set forth herein.

9   91.   Defendants were in a position of power and authority over the Child and owed

10  a legal and constitutional duty to Plaintiff to be truthful in its representations to the juvenile

11  court and obey its orders, which they did not do.

12  92.   Defendants breached these duties.

13  93.   Plaintiff suffered severe emotional distress because of Defendants' actions

14  and other damages in an amount to be proven at trial.

15  94.   Plaintiff is entitled to punitive damages.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENCE**

18  95.   Plaintiff incorporates herein by this reference all the preceding numbered

19  paragraphs as though fully set forth herein.

20  96.   At all times relevant herein, Defendants, and each of them, acted negligently,

21  carelessly, recklessly, and/or unlawfully by engaging in the conduct described herein.

22  97.   Defendants were in a position of power and authority over the Child and owed

23  a legal and constitutional duty to Plaintiff to be truthful in their representations to the

24  juvenile court and obey its orders, which they did not do.

25  98.   Defendants breached these duties.

26

99. As a direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiff suffered damages in an amount to be proven at trial.

100. Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Defendants and each of them as follows:

1. For compensatory and consequential damages;

2. For attorney's fees and costs;

3. For punitive damages; and

4. To grant such other and further relief as the Court feels is just under the circumstances.

'RIGGS, ELLSWORTH & PORTER, PLC

and

MOONEY, WRIGHT, MOORE & WILHOIT, PLLC

By _____
   Wesland J. Wright
   1423 S. Higley Rd., Ste. 113
   Mesa, AZ 85206
   *Attorneys for Plaintiff*

MOONEY, WRIGHT,
)ORE & WILHOIT, PLLC
MESA, AZ

**RIGGS ELLSWORTH & PORTER PLC**
Wesland J. Wright (SBN 029465)
1423 South Higley Rd.  Suite 113
Mesa AZ  85206-3449
Telephone:  (480) 539-9400
Email:  wes@riggslaw.com

**MOONEY, WRIGHT, MOORE & WILHOIT, PLLC**
Paul J. Mooney (No. 006708)
Jim L. Wright (No. 010531)
1201 South Alma School Road, Suite 16000
Mesa, Arizona  85210
Telephone: (480) 615-7500
Email: pmooney@mwmwlaw.com

*Attorneys for Plaintiff*

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| DONALD WILLIAMS, JR.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>STATE OF ARIZONA; ARIZONA DEPARTMENT OF ECONOMIC SECURITY; ARIZONA DEPARTMENT CHILD SAFETY; and LUCERO GARCIA; JOHN DOES I-V; JANE DOES I-V; ABC-XYZ CORPORATIONS; and, BLACK and WHITE PARTNERSHIPS, jointly and Severally,<br><br>　　　　Defendants. | No.:   CV2020-093023<br><br>**CERTIFICATE OF COMPULSORY ARBITRATION**<br><br>(42 U.S.C. § 1983; Interference with Parental Relationship with child; Intentional Infliction of Emotional Distress; Negligence; and Constructive Fraud) |

The undersigned certifies that the largest award sought by the complainant, including

punitive damages, but excluding interest, attorneys' fees, and costs does exceed limits set by

Local Rule for compulsory arbitration.   This case is not subject to the Uniform Rules of Procedure for Arbitration.

RIGGS ELLSWORTH & PORTER PLC

and

MOONEY, WRIGHT, MOORE & WILHOIT, PLLC

By: _____
Wesland J. Wright
1423 S. Higley Rd.  Suite 113
Mesa AZ  85206-3449
*Attorneys for Plaintiff*

- 2 -

ORIGINAL

CLERK OF THE
SUPERIOR COURT
FILED
L. GUTIERREZ, DEP.

2020 MAY 22 AM 11: 05

1    **RIGGS, ELLSWORTH & PORTER PLC**
    1423 South Higley Rd. Suite 113
2    Mesa AZ 85206-3449
    Telephone: (480) 539-9400
3    Wesland J. Wright (SBN 029465)
    Email: wes@riggslaw.com

4    **MOONEY, WRIGHT, MOORE & WILHOIT, PLLC**
5    Paul J. Mooney (No. 006708)
    Jim L. Wright (No. 010531)
6    1201 South Alma School Road, Suite 16000
7    Mesa, Arizona 85210
    Telephone: (480) 615-7500
8    Email: pmooney@mwmwlaw.com

9    Attorneys for Plaintiffs

10         **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

11          **IN AND FOR THE COUNTY OF MARICOPA**

12

13    DONALD WILLIAMS, JR.,                  No.:    CV 2020-093023

14              Plaintiff,

15         v.                               **SUMMONS**

16

17    STATE OF ARIZONA; ARIZONA            (42 U.S.C. § 1983; Interference with
      DEPARTMENT OF ECONOMIC              Parental Relationship with child;
18    SECURITY; ARIZONA                    Intentional Infliction of Emotional
                                           Distress; Negligence; and Constructive
19    DEPARTMENT CHILD SAFETY;            Fraud)
      and LUCERO GARCIA; JOHN DOES
20    I-V; JANE DOES I-V; ABC-XYZ          If you would like legal advice from a lawyer,
      CORPORATIONS; and, BLACK and          Contact the Lawyer Referral Service at
21    WHITE PARTNERSHIPS, jointly and            602-257-4434
                                                     or
22    severally,                               www.maricopalawyers.org
                                                Sponsored by the
23              Defendants.                  Maricopa County Bar Association

24

25    **FROM THE STATE OF ARIZONA TO DEFENDANT:** Mark Brnovich, Attorney
      General for the State of Arizona

26

27        YOU ARE HEREBY SUMMONED and required to appear and defend, within the

28    time applicable, in this action in this Court. If served within Arizona, you shall appear and

                                    - 1 -

defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the day of service. If served out of the State of Arizona - whether by direct service, by registered or certified mail, or by publication - you shall appear and defend within 30 days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director. Service by registered or certified mail without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court. Service by publication is complete 30 days the date of first publication. Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and return receipt or Officer's Return. A.R.C.P. 4; A.R.S. §§ 20-222, 28-502, 28-503.

**ADA Notification**
*(Notificación de la Ley sobre Estadounidenses con Discapacidades)*

**Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least three (3) working days in advance of a scheduled court proceeding.**

*(Las partes deberán presentar a la corte las solicitudes para acomodar de manera razonable a personas con discapacidades por lo menos tres (3) dias hábiles antes de un procedimiento judicial regular.)*

**Interpreter Notification**
*(Notificación de Intérprete)*

**Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case by parties at least ten (10) judicial days in advance of a scheduled court proceeding.**

*(Las solicitudes de intérprete para personas con dominio limitado del idioma inglés deben hacerse a la oficina del juez o comisionado asignado al caso por las partes por lo menos diez (10) dias judiciales antes de un procedimiento judicial regular.)*

YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

YOU ARE CAUTIONED that in order to appear and defend, you must file an Answer of proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any Answer or response upon the Plaintiffs' attorney. A.R.C.P. 10(D); A.R.S. §12-311; A.R.C.P. 5.

The name and address of Plaintiff's attorneys is:

Wesland J. Wright
RIGGS ELLSWORTH & PORTER, PLC
1423 S. Higley Road, Suite 113
Mesa, AZ 85206
and
Paul J. Mooney
Jim L. Wright
MOONEY, WRIGHT, MOORE & WILHOIT, PLLC
1201 South Alma School Road, Suite 16000
Mesa, Arizona  85210

SIGNED AND SEALED this date: _MAY 0 1 2020_, 2020.

JEFF FINE, CLERK

Clerk of the Superior Court



S. Barba
Deputy Clerk

By _S. Barba_
Deputy Clerk



CLERK OF THE
SUPERIOR COURT
FILED
L GUTIERREZ, DEP.

2020 MAY 22  AM 11: 05

**RIGGS, ELLSWORTH & PORTER PLC**
1423 South Higley Rd.  Suite 113
Mesa AZ 85206-3449
Telephone:  (480) 539-9400
Wesland J. Wright (SBN 029465)
Email: **wes@riggslaw.com**

**MOONEY, WRIGHT, MOORE & WILHOIT, PLLC**
Paul J. Mooney (No. 006708)
Jim L. Wright (No. 010531)
1201 South Alma School Road, Suite 16000
Mesa, Arizona  85210
Telephone: (480) 615-7500
Email:  pmooney@mwmwlaw.com

Attorneys for Plaintiffs

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| DONALD WILLIAMS, JR.,<br><br>  Plaintiff,<br><br>  v.<br><br>STATE OF ARIZONA; ARIZONA DEPARTMENT OF ECONOMIC SECURITY; ARIZONA DEPARTMENT CHILD SAFETY; and LUCERO GARCIA; JOHN DOES I-V; JANE DOES I-V; ABC-XYZ CORPORATIONS; and, BLACK and WHITE PARTNERSHIPS, jointly and severally,<br><br>  Defendants. | No.: CV2020 - 093023<br><br>**SUMMONS**<br><br>(42 U.S.C. § 1983; Interference with Parental Relationship with child; Intentional Infliction of Emotional Distress; Negligence; and Constructive Fraud)<br><br>If you would like legal advice from a lawyer, Contact the Lawyer Referral Service at 602-257-4434 or www.maricopalawyers.org Sponsored by the Maricopa County Bar Association |

**FROM THE STATE OF ARIZONA TO DEFENDANT:** Mike Faust, Director of Arizona Department of Child Safety

YOU ARE HEREBY SUMMONED and required to appear and defend, within the time applicable, in this action in this Court.  If served within Arizona, you shall appear and

- 1 -

defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the day of service. If served out of the State of Arizona - whether by direct service, by registered or certified mail, or by publication - you shall appear and defend within 30 days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director. Service by registered or certified mail without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court. Service by publication is complete 30 days the date of first publication. Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and return receipt or Officer's Return. A.R.C.P. 4; A.R.S. §§ 20-222, 28-502, 28-503.

**ADA Notification**
*(Notificación de la Ley sobre Estadounidenses con Discapacidades)*

**Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least three (3) working days in advance of a scheduled court proceeding.**

*(Las partes deberán presentar a la corte las solicitudes para acomodar de manera razonable a personas con discapacidades por lo menos tres (3) dias hábiles antes de un procedimiento judicial regular.)*

**Interpreter Notification**
*(Notificación de Intérprete)*

**Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case by parties at least ten (10) judicial days in advance of a scheduled court proceeding.**

*(Las solicitudes de intérprete para personas con dominio limitado del idioma inglés deben hacerse a la oficina del juez o comisionado asignado al caso por las partes por lo menos diez (10) dias judiciales antes de un procedimiento judicial regular.)*

YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

YOU ARE CAUTIONED that in order to appear and defend, you must file an Answer of proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any Answer or response upon the Plaintiffs' attorney. A.R.C.P. 10(D); A.R.S. §12-311; A.R.C.P. 5.

The name and address of Plaintiff's attorneys is:

Wesland J. Wright
RIGGS ELLSWORTH & PORTER, PLC
1423 S. Higley Road, Suite 113
Mesa, AZ 85206
and
Paul J. Mooney
Jim L. Wright
MOONEY, WRIGHT, MOORE & WILHOIT, PLLC
1201 South Alma School Road, Suite 16000
Mesa, Arizona 85210

SIGNED AND SEALED this date: __MAY 0 1 2020__, 2020. JEFF FINE, CLERK



Clerk of the Superior Court

S. Barba
Deputy Clerk

Deputy Clerk

Wesland Wright
Riggs Ellsworth & Porter PLC
1423 S. Higley Rd. #113
Mesa, AZ 85206
(480) 539-9400
Bar No. 029465

 ORIGINAL

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

**DONALD WILLIAMS JR.,**

Plaintiff,

vs.

**STATE OF ARIZONA, et al,**

Defendant.

Case Number: CV2020-093023

**DECLARATION OF SERVICE BY A
PRIVATE PROCESS SERVER**

Received by Rush Hour Legal Service to be served on ATØRNEY GENERAL MARK BRNOVICH.

I, Christina Donaldson, do hereby affirm that on the **21st day of May, 2020** at **4:22 pm, I:**

served **ATORNEY GENERAL MARK BRNOVICH** by delivering a true copy of the **Summons; Complaint; Certificate of Compulsory Arbitration** with the date and hour of service endorsed thereon by me, to: **LISA FISHER (Receptionist Authorized)** at the address of: **2005 N. Central Ave., Phoenix, AZ 85004**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 60, Sex: F, Race/Skin Color: White, Height: 5'4", Weight: 140, Hair: Gray, Glasses: Y

I, being fully qualified under ARCP 4(e) to serve process within the State of Arizona and having been so appointed by Maricopa County Superior Court, Declare under penalty of perjury that the foregoing is true and correct and was executed on the above date.

Christina Donaldson
MC 8800

**Rush Hour Legal Service
P.O. Box 30997
Mesa, AZ 85275
(480) 797-9483**

Our Job Serial Number: RUL-2020000933
Ref: Williams; 9010.001; Wes Wright
Service Fee: $75.00

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1g



Wesland Wright
Riggs Ellsworth & Porter PLC
1423 S. Higley Rd. #113
Mesa, AZ 85206
(480) 539-9400
Bar No. 029465



ORIGINAL

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

**DONALD WILLIAMS JR.,**

Plaintiff,

Case Number: CV2020-093023

**DECLARATION OF SERVICE BY A
PRIVATE PROCESS SERVER**

vs.

**STATE OF ARIZONA, et al,**

Defendant.

Received by Rush Hour Legal Service to be served on **LUCERO GARCIA CASE MANAGER**.

I, Russell D. Hoffman, do hereby affirm that on the **22nd day of May, 2020** at **2:45 pm**, I:

served **LUCERO GARCIA CASE MANAGER** by delivering a true copy of the **Summons; Complaint; Certificate of Compulsory Arbitration** with the date and hour of service endorsed thereon by me, to: **BENJAMIN HARPER (Security Guard Authorized)** at the address of: **1201 S. Alma School Rd., Mesa, AZ 85210**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 22, Sex: M, Race/Skin Color: White, Height: 5'9", Weight: 200, Hair: -, Glasses: N

I, being fully qualified under ARCP 4(e) to serve process within the State of Arizona and having been so appointed by Maricopa County Superior Court, Declare under penalty of perjury that the foregoing is true and correct and was executed on the above date.

Russell D. Hoffman
Process Server MC-7486

**Rush Hour Legal Service**
**P.O. Box 30997**
**Mesa, AZ 85275**
**(480) 797-9483**

Our Job Serial Number: RUL-2020000935
Ref: Williams; 9010.001; Wes Wright
Service Fee: $84.00

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1g

Wesland Wright
Riggs Ellsworth & Porter PLC
1423 S. Higley Rd. #113
Mesa, AZ 85206
(480) 539-9400
Bar No. 029465



**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

**DONALD WILLIAMS JR.,**

Plaintiff,

vs.

**STATE OF ARIZONA, et al,**

Defendant.

Case Number: CV2020-093023

**DECLARATION OF SERVICE BY A
PRIVATE PROCESS SERVER**

Received by Rush Hour Legal Service to be served on **MIKE FAUST DIRECTOR OF AZ DEPT. OF CHILD SAFETY.**

I, Christina Donaldson, do hereby affirm that on the **21st day of May, 2020 at 4:40 pm, I:**

served **MIKE FAUST DIRECTOR OF AZ DEPT. OF CHILD SAFETY** by delivering a true copy of the **Summons; Complaint; Certificate of Compulsory Arbitration** with the date and hour of service endorsed thereon by me, to: **JENNIFER - (Receptionist Authorized)** at the address of: **3003 N. Cental Ave. 23rd Floor, Phoenix, AZ 85012**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 30, Sex: F, Race/Skin Color: White, Height: 5'6", Weight: 105, Hair: Brown, Glasses: N

I, being fully qualified under ARCP 4(e) to serve process within the State of Arizona and having been so appointed by Maricopa County Superior Court, Declare under penalty of perjury that the foregoing is true and correct and was executed on the above date.

Christina Donaldson
MC 8800

**Rush Hour Legal Service
P.O. Box 30997
Mesa, AZ 85275
(480) 797-9483**

Our Job Serial Number: RUL-2020000934
Ref: Williams; 9010.001; Wes Wright
Service Fee: $75.00

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1g

